FILED

07/08/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0327

DA 23-0327

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 147

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

STEPHEN ERIC WALKS,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDC-2022-29
Honorable Christopher D. Abbott, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Joseph P. Howard, Joseph P. Howard, P.C., Helena, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
Attorney General, Helena, Montana

      Kevin Downs, Lewis and Clark County Attorney, Mary Barry, Deputy
County Attorney, Helena, Montana

Submitted on Briefs:  April 2, 2025

Decided:  July 8, 2025

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Stephen Walks appeals from the judgment of conviction entered by the First Judicial District Court, Lewis and Clark County, after a jury found Walks guilty of felony sexual assault and two counts of felony sexual intercourse without consent. We restate and address the following issue:

> *Did the District Court abuse its discretion by allowing the jury unrestricted and unsupervised access to the complaining witnesses' drawings during the jury's deliberations?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 The State charged Walks with two counts of sexual intercourse without consent, felonies, in violation of § 45-5-503(4), MCA, and two counts of sexual assault, felonies, in violation of § 45-5-502(3), MCA. The charges stemmed from disclosures made by Walks' then six-year-old step-granddaughters, K. and K.P. Walks was married to K. and K.P.'s paternal grandmother, Nancy. In November 2020, K.P. told her mother, A.P., that Walks had touched K.P.'s "private parts." A.P. reported Walks to the police. Paula Samms, a licensed clinical professional counselor, conducted a forensic interview of K.P. K.P. drew two pictures during the interview about separate incidents that allegedly occurred at Walks and Nancy's residence. As she drew each scene, K.P. explained Walks touched her "private" with his hand, once in the garage and another time in the living room. Samms gave K.P. an anatomical diagram on which K.P. drew an X over the vaginal area and buttocks to identify where Walks touched her. K.P. informed Samms that Walks engaged in similar conduct with her sister, K. Samms conducted a forensic interview of K. a few

days later. K. disclosed to Samms that Walks touched her inappropriately. During the interview, K. drew a picture purportedly showing the area of the living room where the incident occurred. Audio-visual recordings were made of both interviews.

¶3 K.P. and K. testified at trial when they were eight years old. K.P. expressed her reluctance to testify, but she acknowledged she told Samms about what she hesitated to discuss in court. When shown the image she drew of the garage incident, K.P. could not recall making it. K.P. denied the garage incident occurred. She did allege, however, that something happened with Walks in the living room. The State asked K.P. to identify the body part Walks touched during the living room incident. K.P. responded, "I don't want to say." The State presented Exhibit 20, a copy of the anatomical drawing Samms utilized during K.P.'s interview, and inquired whether K.P. could point to the body part. K.P. agreed to circle the body part instead, circling the vaginal area on the diagram with blue ink. Exhibit 20, as modified by K.P., was admitted into evidence without objection. When the State asked what touched the circled body part, K.P. answered, "I'll draw it." K.P. drew a hand. She initially refused to identify to whom the hand belonged. Upon further inquiry, K.P. confirmed it was Walks' hand. K.P.'s drawing of the hand, identified as State's Exhibit 24, was admitted into evidence without objection.

¶4 K. testified next and confirmed she spoke with Samms. K. could not remember what she disclosed to Samms. K. did not know whether Walks did something that hurt her. K. could not remember making several statements during her interview about Walks' demeanor and behavior.

3

¶5    The State called Samms to testify about K. and K.P.'s respective forensic interviews. The State sought to introduce redacted recordings of the interviews. Over Walks' objections, the redacted recordings were admitted into evidence and played for the jury.[1] Samms testified that State's Exhibit 21 was the picture K. drew of the living room during her forensic interview. K., referring to the picture, alleged in the interview clip: "That was him touching my private . . . he went under my panties." K. said it hurt and clarified Walks' finger was on the "inside" of her "private." Samms described to the jury what the shapes in the drawing represented. Exhibit 21 was admitted into evidence and published to the jury without objection.

¶6    During the State's presentation of the video excerpts from K.P.'s interview, Samms confirmed State's Exhibits 18 and 19 were the pictures K.P. drew of the garage and living room incidents. Samms, referring to Exhibit 18, explained: "[K.P. identified Walks as] the one with the stripes on the shirt . . . This is what [K.P.] described as herself . . . Then [K.P.] drew the line of [Walks'] hand to her private area there . . . This is the garage door . . . then [K.P.] started drawing this big square and she's telling me this is the garage." Regarding Exhibit 19, Samms explained: "So this was the living room . . . and this is her. This is [Walks] with the stripes again . . . you can see the hand coming from here over to where [K.P.'s] private is." Exhibits 18 and 19 were admitted into evidence and published to the jury without objection. Lastly, Samms identified State's Exhibit 29 as a color copy of the anatomical diagram she utilized during K.P.'s interview. Exhibit 20—the diagram on

---

[1] On appeal, Walks does not challenge the admission of the redacted interview recordings.

4

which K.P. circled in blue ink during her testimony—was a copy of Exhibit 29. Samms explained that , when she asked K.P. to identify where she was touched, "[K.P.] put a cross over the vaginal area and a cross on the butt." Exhibit 29 was admitted into evidence and published to the jury without objection.

¶7     A.P. and Nancy testified about K.P.'s disclosures to them. Nancy confirmed K.P. made a disclosure regarding the garage incident while Nancy was bathing her. When Nancy asked Walks about K.P.'s statement, Walks told her K.P. almost fell down the stairs in the garage, but he caught her.

¶8     Walks testified that he caught K.P. in the garage to prevent her from falling, during which time he may have touched K.P.'s back and legs. Walks denied K.'s allegations and K.P.'s allegations concerning the living room incident. Laura Marcille, a nurse practitioner who reviewed K.P. and K.'s forensic sexual abuse physical exam reports, testified neither report documented any abnormal findings.

¶9     Prior to closing arguments, the District Court held a discussion with the parties regarding what exhibits the jury would take into deliberations. The parties stipulated that the jury would not have unsupervised access to the redacted interview recordings. Walks objected to giving the jury the exhibits of K. and K.P.'s drawings from their forensic interviews and K.P.'s drawings made at trial, arguing they were testimonial in nature. The District Court overruled Walks' objection and allowed the jury to take State's Exhibits 18, 19, 21, and 29 (collectively, Forensic Interview Drawings) and Exhibits 20 and 24 (collectively, Trial Drawings) into the jury room. After deliberating for about an hour, the

5

jury returned a verdict finding Walks guilty of felony sexual assault and two counts of felony sexual intercourse without consent.

## STANDARDS OF REVIEW

¶10 "We review a district court's decision allowing exhibits to be taken into jury deliberations for an abuse of discretion." *State v. Green*, 2022 MT 218, ¶ 11, 410 Mont. 415, 519 P.3d 811. A district court abuses its discretion when it acts arbitrarily, unreasonably, or without the employment of conscientious judgment, resulting in substantial injustice. *Green*, ¶ 11.

## DISCUSSION

¶11 *Did the District Court abuse its discretion by allowing the jury unrestricted access to the complaining witnesses' drawings during the jury's deliberations?*

¶12 Generally, jurors may take into the jury room "all exhibits that have been [admitted] as evidence in the [case] that in the opinion of the court will be necessary" to their deliberations. Section 46-16-504, MCA. However, the submission of testimonial evidence to the jury for unsupervised and unrestricted review is prohibited. *Green*, ¶ 14; *State v. Hoover*, 2021 MT 276, ¶ 16, 406 Mont. 132, 497 P.3d 598; *State v. Bales*, 1999 MT 334, ¶ 23, 297 Mont. 402, 994 P.2d 17. Adherence to that rule prevents the jury from placing "undue emphasis" on testimonial evidence reviewed during deliberation "to the exclusion of the evidence presented by other witnesses for which the jury must rely upon its collective memory." *Green*, ¶ 14 (citation omitted).

¶13 When assessing whether the jury may access certain evidence, the threshold question is whether the evidence is either testimony or testimonial in nature; if it is not, the

6

limitation does not apply, and the jury may take the evidence into the jury room. *Hoover*, ¶ 18. The rule proscribes giving the jury unsupervised access to witnesses' trial testimony, whether by written transcript or other recording. *Hoover*, ¶ 18. We have also recognized that testimonial evidence subject to the rule includes written and electronic recordings of individuals' out-of-court statements. *See Hoover*, ¶¶ 4, 5, 21 (video footage with audio of defendant's police interrogation and defendant's conversation with victim); *State v. Nordholm*, 2019 MT 165, ¶¶ 6, 11, 396 Mont. 384, 445 P.3d 799 (police body-camera footage with audio of conversations between officers and defendant and other witnesses); *Bales*, ¶¶ 9, 16 (audio recording of defendant's interview by officer investigating accident).

¶14 The District Court concluded the disputed drawings were not testimony or testimonial in nature. The District Court determined the jury's review of the drawings during deliberations would not cause the jury to unduly emphasize the drawings to the exclusion of other evidence, analogizing the circumstances of this case to those in *State v. Stout*, 2010 MT 137, 356 Mont. 468, 237 P.3d 37, and *Green*. The District Court reasoned:

> [T]he communicative content of the [drawings] is limited. The explanation is not going to be obviously repeated back to the jury, they had to listen to that in court. It's not a situation where they have a transcript of [testimony] or a detailed recitation where there would be a plain influence on it.

¶15 Walks contends the District Court abused its discretion by allowing the jury unsupervised and unrestricted access to the drawings. Walks relies on the *Black's Law Dictionary* definition we cited in *Stout*, arguing the State offered the drawings to prove that

Walks perpetrated the crimes, and the drawings communicated K. and K.P.'s allegations against Walks.

¶16 The State argues the Forensic Interview Drawings are not testimonial evidence because the meaning of the Forensic Interview Drawings cannot be discerned without the corresponding forensic interviews and trial testimony, which the jury heard only once. The State concedes that the Trial Drawings were testimonial evidence because they were presented as part of, or in lieu of, K.P.'s testimony about the living room incident, and that the District Court abused its discretion by allowing the jury to take the Trial Drawings into the jury room. The State asserts that the error was harmless, however, and does not warrant reversal. We address the Forensic Interview Drawings and Trial Drawings separately.

**Forensic Interview Drawings (Exhibits 18, 19, 21, and 29)**

¶17 In *Stout*, we explained testimonial evidence subject to the limiting rule is generally identified by analogy. *Stout*, ¶ 30. We cited *Black's Law Dictionary*, which defined "testimonial evidence" as a "person's testimony offered to prove the truth of the matter asserted; esp., evidence elicited from a witness. Also termed communicative evidence; oral evidence." *Stout*, ¶ 30 (citing *Testimonial Evidence*, *Black's Law Dictionary* (9th ed. 2009)). We determined the disputed expert report exhibits given to the jury in that case were not testimonial evidence because the exhibits merely related to, and were consistent with, testimony from the State's witnesses, rather than being a recording or transcript of the experts' testimony. *Stout*, ¶¶ 31–35.

¶18 *Green* involved silent security camera footage admitted into evidence and given to the jury for unrestricted replay during deliberations. *Green*, ¶ 10. Footage taken from a

8

neighbor's security camera showed the victim entering the residence she shared with the defendant and failing to emerge. *Green*, ¶ 4. That camera subsequently captured the defendant cradling a large, heavy object and placing it in his truck, loading the truck with a shovel and other items, and lighting another object on fire in the driveway before driving off. *Green*, ¶ 6. Because the silent surveillance footage did not have any communicative content, we determined the silent footage was "indistinguishable from a properly admitted series of crime-scene photographs, which have traditionally been made available for review during jury deliberations without raising any concern of undue emphasis." *Green*, ¶ 17. Accordingly, we held the footage "was neither testimonial in nature nor carried any substantial risk of undue emphasis." *Green*, ¶ 20.

¶19 In this case, the Forensic Interview Drawings are more akin to the silent surveillance footage in *Green*. The Forensic Interview Drawings do not contain appreciable, recorded communications from one person to another. *See Green*, ¶ 15. They hardly resemble the testimony or recordings of out-of-court statements at issue in *Hoover*, *Nordholm*, and *Bales*. Without Samms' testimony and the redacted forensic interview recordings, it is not apparent from the Forensic Interview Drawings themselves that Walks was the perpetrator or what crimes he allegedly committed. K.P.'s drawings—Exhibits 18 and 19—depict human-like figures and lines drawn between them, but it is not discernible who or where the figures are. K.'s drawing—Exhibit 21—is even more rudimentary, consisting of a few boxes and circles. The fact that the Forensic Interview Drawings "relate to and are consistent with" Samms' testimony and the interview recordings is "true for most pieces

9

of evidence admitted in most trials and does not form the basis for excluding items of evidence from the jury deliberations." *Green*, ¶ 19 (citing *Stout*, ¶ 32).

¶20 Relying on *Stout*, Walks argues the Forensic Interview Drawings are testimonial evidence because they were "offered to prove the truth of the matter asserted" and constitute "evidence elicited from a witness." But as previously discussed, Walks fails to make the threshold showing that the Forensic Interview Drawings are a *"person's testimony* offered to prove the truth of the matter asserted." *Stout*, ¶ 30 (emphasis added) (citing *Testimonial Evidence*, *Black's Law Dictionary* (9th ed. 2009)). Neither does Samms' "request" that K. and K.P. illustrate what happened to them transform the Forensic Interview Drawings into "evidence elicited from a witness." This Court held in *Stout* that the expert report exhibits at issue there—authored by the State's witnesses at the State's request—were *not* testimonial evidence. *Stout*, ¶¶ 32–35. Like the experts in *Stout*, K. and K.P. testified and were cross-examined at trial. The District Court properly instructed the jury on its power and duty to evaluate the testimony of each witness and determine the weight given to the evidence presented. "Trial court judges are given broad discretion to determine which exhibits would be necessary to help the jury in deciding the case." *Stout*, ¶ 35.

¶21 We recognize Walks' argument analogizing this situation to *Nordholm*. During deliberations in that case, the jury was given unrestricted access to four police body-camera video recordings, which captured conversations between various officers, the defendant, the victim, and other witnesses. *Nordholm*, ¶¶ 4–6. Unlike the recordings in *Nordholm*, however, the Forensic Interview Drawings in this case lacked independent testimonial

10

clarity. Their evidentiary significance depended entirely upon K. and K.P.'s testimony, the context they provided during trial, and the forensic interviews, none of which were accessible for repeated jury review. There was no comparable risk of undue emphasis as identified in *Nordholm*. *See Nordholm*, ¶ 13.

¶22 Far from the testimonial recordings in *Nordholm*—which posed a clear risk of undue emphasis due to their intelligible communicative content—the Forensic Interview Drawings had no inherent testimonial character. Their meaning depended on the jury's independent recollection of the trial testimony and K. and K.P.'s forensic interviews. Comparable to the expert reports in *Stout* and the silent surveillance footage in *Green*, the Forensic Interview Drawings served primarily as illustrative evidence, requiring witness testimony for context and interpretation. Their availability to the jury during deliberations presented minimal risk of undue emphasis or prejudice. The District Court did not abuse its discretion by allowing the Forensic Interview Drawings to accompany the jury during deliberations.

**Trial Drawings (Exhibits 20 and 24)**

¶23 A violation of the rule prohibiting the jury's unsupervised and unrestricted access to testimonial evidence during deliberations is trial error rather than structural error. *Hoover*, ¶ 23; *Nordholm*, ¶ 12; *State v. Hart*, 2009 MT 268, ¶ 35, 352 Mont. 92, 214 P.3d 1273. To prove that this error was harmless, "the State must demonstrate that there is 'no reasonable possibility' that the unsupervised review" of the Trial Drawings by the jury during its deliberations might have contributed to Walks' conviction. *Nordholm*, ¶ 12 (quoting *State v. Van Kirk*, 2001 MT 184, ¶ 47, 306 Mont. 215, 32 P.3d 735). The

State may satisfy this burden "by pointing to other admitted 'evidence that proved the same facts as the tainted evidence' and showing by qualitative comparison that it could not reasonably have contributed to the conviction." *Hoover*, ¶ 23 (quoting *Van Kirk*, ¶ 47).

¶24 In *Hart*, we considered whether the bailiff's erroneous provision of video equipment to the jury to play admitted recordings of patrol-car videos was harmless error. *Hart*, ¶¶ 28–30, 35. The jury had access to three videos in the jury room. *Hart*, ¶¶ 28, 32. On the jury's request, the bailiff brought the equipment and queued up one of the videos, left the room, and then retrieved the equipment five to ten minutes later. *Hart*, ¶¶ 29–30. We noted the videos were not the only evidence of the defendant's guilt. *Hart*, ¶ 36. The other evidence included the victim's blood found on the defendant's vehicle, independent witness testimony regarding the defendant's alcohol consumption before the accident, and the defendant's admission that he hit "something or someone." *Hart*, ¶ 36. We held the erroneous playback of one or more of the patrol-car videos was harmless error because the videos were not essential to the State's case and were at most cumulative of other, stronger evidence "admitted to establish the same facts." *Hart*, ¶ 36.

¶25 Conversely, in *Nordholm*, we held that it was not harmless error to allow the jury to have unrestricted access to four recordings of statements made to police by witnesses and the defendant. *Nordholm*, ¶ 14. On appeal, the State conceded three of the disputed videos contained testimonial evidence. *Nordholm*, ¶ 11. Although the other evidence presented at trial proved "at least some" of the facts asserted in the videos, we concluded the qualitative effect of the jury's review of the videos was "both unknown and unknowable" because the jury had unsupervised access to replay the videos as many times as they

12

wished. *Nordholm*, ¶ 13. Because the jury could repeatedly play the videos and therefore place "undue emphasis" on the testimonial evidence in the videos, we reversed for a new trial because the State could not prove that there was no reasonable possibility the jury's review of the testimonial evidence contributed to the defendant's conviction. *Nordholm*, ¶ 14.

¶26 Although the State acknowledges that the Trial Drawings were testimonial, the State also presented other compelling cumulative evidence proving the same facts as the Trial Drawings, and, by qualitative comparison, there is no reasonable possibility that the limited communicative content of the Trial Drawings contributed to Walks' conviction. Exhibit 20, the anatomical drawing modified by K.P. at trial, and Exhibit 24, the drawing of a hand, were introduced by the State to prove Walks committed sexual assault on K.P. in the living room incident; namely, that Walks touched K.P.'s vulva with his hand. *See* §§ 45-2-101(67), 45-5-502(3), MCA. In K.P.'s redacted interview recording that was played for the jury, K.P. repeatedly stated that Walks touched her "private" with his hand after he "pulled [her] pants down" when she was sitting on a couch in the living room. At trial, K.P. verbally confirmed it was Walks' hand that she had drawn a few moments earlier. Through K.P.'s forensic interview and trial testimony, the State independently presented other substantial and more compelling evidence of Walks' guilt when compared to the Trial Drawings. *See Hoover*, ¶ 27 (citing *Hart*, ¶ 36; *State v. Giddings*, 2009 MT 61, ¶¶ 97–98, 349 Mont. 347, 208 P.3d 363).

¶27 Moreover, like the Forensic Interview Drawings, the Trial Drawings are distinguishable from the police body-camera video recordings taken into the jury room in

13

*Nordholm*. Those recordings captured out-of-court conversations between police officers, the defendant, the victim, and multiple witnesses concerning the events leading up to the defendant's arrest. *Nordholm*, ¶¶ 4–6. Exhibit 20 neither identifies Walks as the perpetrator nor communicates K.P.'s allegations as to what transpired in the living room. Exhibit 24 does not include any identifying features. Our concern in *Nordholm* that the jury repeatedly viewed the out-of-court statements made in the videos to the exclusion of trial testimony, including statements made during cross-examination, is not present here. *Nordholm*, ¶¶ 13–14.

¶28 While the State concedes the Trial Drawings were testimonial, we emphasize that their testimonial value was cumulative and substantially overshadowed by other compelling evidence presented at trial. Unlike *Nordholm*, where the jury had unrestricted access to recordings of verbal statements made to police, the Trial Drawings in this case lacked clear, independent testimonial characteristics. Their meaning hinged on the jury's recollection of K.P.'s trial testimony and forensic interview. Given this qualitative difference, the State has demonstrated the error of allowing unsupervised access to the Trial Drawings did not reasonably contribute to Walks' conviction and was harmless. *See Hart*, ¶¶ 36–37.

## CONCLUSION

¶29 The District Court did not abuse its discretion by allowing the jury unsupervised access to the Forensic Interview Drawings during deliberations. Any error in allowing the jury unsupervised access to the Trial Drawings was harmless. Walks' judgment of conviction is affirmed.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M BIDEGARAY
/S/ INGRID GUSTAFSON
/S/ JIM RICE